1

2

3

4

5

6

7

8                      UNITED STATES DISTRICT COURT

9                     EASTERN DISTRICT OF CALIFORNIA

10

11   DAVID BACK,
                                  NO. CIV. S-04-5 LKK/CMK
12
             Plaintiff,
13
        v.                               O R D E R
14
     ALLSTATE INSURANCE COMPANY,
15   INC.,

16           Defendant.
     _____/
17

18       Plaintiff brought suit against defendants alleging four

19   causes of action: breach of duty to defend, breach of contract,

20   breach of duty to settle, and breach of the covenant of good faith

21   and fair dealing.  Compl. at 7-8.  Pending before the court are the

22   parties' cross-motions for summary judgment/adjudication as to a

23   myriad of issues, discussed _infra_.  I decide the motions based on

24   the parties' papers and after oral argument.

25   ////

26   ////

**I.**

**FACTS[1]**

**A.  THE SOULTS' HOMEOWNERS INSURANCE POLICY**

On July 8, 2001, Deborah Soult, Troy Soult, and Jonathan Soult were insured under an Allstate homeowners insurance policy.  Def.'s SUF 1.  The policy insured the Soult family to the extent of $300,000 for each claim involving legal liability or damages on account of negligence or negligent conduct for the policy period of December 28, 2000 to December 27, 2001.  Def.'s Ex. 2.  The Soults' Allstate homeowners insurance policy contained the following exclusion:

5.  We do not cover bodily injury or property damage arising out of the ownership, maintenance, use occupancy, renting, loaning, entrusting, loading or unloading of any motor vehicle or trailer. However, this exclusion does not apply to:

(a) a motor vehicle in dead storage or used exclusively on an insured premises;
(b) any motor vehicle designed principally for recreational use off public roads, unless that vehicle is owned by an insured person and is being used away from an insured premises;
(c) a motorized wheelchair;
(d) a vehicle used to service an insured premises which is not designed for use on public roads and not subject to motor vehicle registration
(e) a golf cart owned by an insured person when used for golfing purposes;
(f) a trailer of the boat, camper, home or utility type unless it is being towed or carried by a motorized land vehicle;
(g) lawn and garden implements under 40 horsepower;
(h) bodily injury to a residence employee.

Def.'s SUF 2.

----

[1]  The facts are undisputed unless otherwise noted.

**B.   THE 1977 FORD LTD.**

In July 2001, Teresa Voboril gave Dennis Martin a 1977 Ford Ltd.  Def.'s SUF 4.  The Ford was parked in Teresa Voboril's yard and was not in use between 1993 and July 2001.  Pl.'s SUF 15. Between 1993 and 1994, the Ford was difficult to start and often required priming by using starting fluid.  Pl.'s SUF 2.  After 1993, the Ford was kept in the same place and not parked under any kind of cover.  After the passenger window was broken out, animals went in and out of the Ford and cats often slept in it.  Pl.'s SUF 23.  Teresa Voboril attempted to spray Lysol inside, but "once the windows were broken out and the cats were in there, it was no use." Pl.'s SUF 25.  The interior was moldy and mildewed.  The hinges were worn out on the hood, and the Ford was started only from time to time after it was parked at the Voboril residence.  Pl.'s SUF 10.  Teresa Voboril stated that, at the time she gave the Ford to Martin, she did not believe the car was driveable, Pl.'s SUF 29, and that she believed the only thing of value was the engine. Pl.'s SUF 33.  Martin felt the vehicle was unsafe and "never had it in his mind" to put the car in driveable condition.  Pl.'s SUF 77.  Martin never registered the Ford to be driven on the highway. Pl.'s SUF 78.  Within a year of the July 8, 2001 accident, the 1977 Ford Ltd. was sent to a junkyard and destroyed.  Def.'s SUF 12.

**C.  DAVID BACK'S INJURIES**

On the morning of July 8, 2001, Dennis Martin explained to his nephew, Jonathan Soult, that the Ford Ltd. "was given to [him] for parts and [he] was going to use the engine, so [he] wanted to hear

3

1 it fire." Martin Dep. at 18.  After they "got it to fire," the car

2 "ran out of gas," so Martin and his friend, David Back, went to the

3 gas station.  Id. at 19.  Although Martin allegedly warned David

4 Back not to pour the gasoline in the carburetor, Back did so

5 anyway, which led to a flame "shoot[ing] out of the carburetor."

6 Def.'s SUF 5, Martin Dep. at 20.  Jonathan Soult was behind the

7 wheel of the 1977 Ford Ltd. when it backfired and injured Back.

8 Def.'s SUF 6.  Back was badly burned.[2]  On July 8, 2001, the 1977

9 Ford Ltd. started and ran from 30 seconds to one minute.  Def.'s

10 SUF 9.  Jonathan Soult told his mother, Deborah Soult, about the

11 accident within a matter of days.  Def.'s SUF 11.

12 **D.   BACK SUES MARTIN AND THE SOULTS; ALLSTATE'S ACTIONS**

13      In February 2002, Back sued Dennis Martin for the injuries he

14 suffered while priming the 1977 Ford Ltd.'s carburetor.  Def.'s SUF

15 13.  The California State Automobile Association (CSAA) Inter-

16 Insurance Bureau hired the firm of Maire, Mansell & Beasley to

17 defend Martin.  Def.'s SUF 14.  In August 2002, Back settled his

18 claims against Martin.  Def.'s SUF 15.

19      In November 2002, Back served his complaint for the injuries

20 he suffered while priming the 1977 Ford Ltd.'s carburetor on

21 Jonathan Soult and Deborah Soult.  Def.'s SUF 16.  CSAA retained

22 Maire, Mansell & Beasley to defend the Soults.  Def.'s SUF 17.  In

23 December 2002, Allstate first received a copy of Back's complaint

24 ───────────────

25      [2]  Martin explained in his deposition that Back suffered
additional injuries because he was wearing a nylon shirt which made
26 the fire difficult to put out.  Martin Dep. at 21.

against the Soults.  Def.'s SUF 18.  On December 11, 2002,
Allstate's adjustor, Case Plooy, spoke with one of the Soults'
lawyers, who said that CSAA had retained them and that David Back
was injured when an automobile backfired.  Def.'s SUF 19.

Plooy did not hire an outside field adjuster to investigate
the scene of the incident.  Pl.'s SUF 44, 45.  Allstate did,
however, hire the firm of Sonnenschein, Nath & Rosenthal to obtain
information about the claim and to provide a coverage analysis.
Def.'s SUF 20.  Plooy relied on the coverage counsel to
investigate, but was unaware of whether the coverage counsel
examined any photographs of the automobile, or whether anybody with
automotive repair experience examined the automobile.  He was also
unaware of any information that suggested the Ford was capable of
self-propulsion.  Pl.'s SUF 50.  On December 12, 2002, Allstate's
lawyers at the Sonnenschein firm sent the Soults' lawyer a letter
that, <u>inter</u> <u>alia</u>, asked them to provide information about their
claim and reserving Allstate's rights.  Def.'s SUF 21.  On December
16, 2002, Allstate's lawyers received a letter from the Soults'
lawyers formally tendering their claim for defense and indemnity
under the Soults' homeowners policy. Def.'s SUF 22.  Other than
Plooy's December 11, 2002 telephone conversation with the Soults'
lawyer and the Soults' tender letter and its enclosures, the Soults
did not provide any additional information to Allstate about their
claim. Def.'s SUF 25.

On January 15, 2003, Allstate's lawyer sent a letter denying
the claim, explaining that the information provided to it showed

5

1  that the accident arose out of the use or maintenance of a motor

2  vehicle and that "[a]lthough there are numerous exceptions to

3  Exception 5, we have no information suggesting that any of them

4  applies." Def.'s SUF 26.  Allstate's denial letter stated, "If our

5  understanding of the relevant facts is incorrect or incomplete, we

6  trust you will so inform us.  For instance if the loss did not

7  involve a passenger motor vehicle, we would need to know that."

8  Def.'s SUF 27.  The Soults did not respond to the denial letter.

9  Def.'s SUF 28.  At that time, the Soults did not dispute Allstate's

10  conclusion that the motor vehicle exclusion applied, nor did they

11  dispute the conclusion that the 1977 Ford Ltd. was a motor vehicle.

12  Def.'s SUF 29, 30.

13      The parties dispute whether Allstate ever received or knew

14  about a policy-limits settlement offer from David Back until this

15  lawsuit was filed.[3]  Def.'s SUF 31, 32.  The policy-limits demand

16  letter that Back allegedly sent to Allstate only offered to release

17  Deborah Soult, and not Troy or Jonathan Soult.  Def.'s SUF 33, 34.

18  The demand letter did not offer to resolve medical liens.  Id.

19  ////

20  ////

21  ////

22  ////

23

24      [3]  The letter attached as Exhibit 10 to plaintiff's motion is
    dated February 19, 2003 and, as defendant notes, is not on
    letterhead.  The letter states that "Mr. Back has authorized a
25  settlement demand of $299,999.00" and that "[t]he purpose of this
    demand is to give defendant Deborah Soult an opportunity to settle
26  within policy limits of the homeowner's insurance."  Pl.'s Ex. 10.

1    Ultimately, the Soult family allowed Back to obtain a judgment

2  against Jonathan Soult and assigned all of their rights as a first

3  party insured to Back.[4]  Compl. at 4.  On or about November 6,

4  2003, plaintiff obtained a judgment against Jonathan Soult in the

5  amount of $3,400,124.70.  Id.  In January 2004, Back sued Allstate

6  in his own right to collect on his judgment against Jonathan Soult.

7  Because Deborah Soult assigned her rights against Allstate to Back,

8  he also sued Allstate for breaching its insurance contract with her

9  and for "bad faith" in connection with that breach.  Id.  As

10  Soults' assignee, Back alleges that there was coverage for the

11  accident and that Allstate is liable for bad faith because it did

12  not accept his policy-limits settlement demand.  The complaint

13  prays for $38.4 million in damages.  Id.

**II.**

**SUMMARY ADJUDICATION STANDARDS**

16    Summary adjudication, or partial summary judgment "upon all

17  or any part of a claim," is appropriate where there is no genuine

18  issue of material fact as to that portion of the claim.  Lies v.

19  Farrell Lines, Inc., 641 F.2d 765, 769 (9th Cir. 1981) ("Rule 56

20  authorizes a summary adjudication that will often fall short of a

---

22    [4]  Back and the Soults' lawyers agreed that: (1) Jonathan
Soult would suffer judgment without putting on any defense;  (2)
23  Deborah Soult would also assign to Back any rights she had against
Allstate because it denied the claim;  (3)  CSAA would pay Back the
24  $15,000 remaining under Martin's auto policy's limits; and (4)
Back agreed not to try to record or collect on his judgment against
25  the Soults.
    Cal. Ins. Code § 11580(b)(2) permits a judgment creditor to
26  proceed directly against the insurer for the responsible party.

1  final determination, even of a single claim") (citations omitted);

2  <u>Playboy Enters., Inc. v. Welles, Inc.</u>, 78 F. Supp. 2d 1066, 1073

3  (S.D. Cal. 1999), <u>aff'd in part, rev'd in part, on other grounds</u>,

4  279 F.3d 796 (9th Cir. 2002); E.D. Local Rule 56-260(f).

5      Under summary judgment practice, the moving party

6      always bears the initial responsibility of informing the
       district  court  of  the  basis  for  its  motion,  and
7      identifying   those   portions   of   'the   pleadings,
       depositions, answers to interrogatories, and admissions
8      on file, together with the affidavits, if any,' which it
       believes demonstrate the absence of a genuine issue of
9      material fact.

10 <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the

11 nonmoving  party  will  bear  the  burden  of  proof  at  trial  on  a

12 dispositive  issue,  a  summary  judgment  motion  may  properly  be  made

13 in  reliance  solely  on  the  'pleadings,  depositions,  answers  to

14 interrogatories,  and  admissions  on  file."   <u>Id.</u>   Indeed, summary

15 judgment  should  be  entered,  after  adequate  time  for  discovery  and

16 upon motion, against a party who fails to make a showing sufficient

17 to establish the existence of an element essential to that party's

18 case,  and  on  which  that  party  will  bear  the  burden  of  proof  at

19 trial.   <u>See</u> <u>id.</u> at 322.   "[A] complete failure of proof concerning

20 an  essential  element  of  the  nonmoving  party's  case  necessarily

21 renders all other facts immaterial."   <u>Id.</u>   In such a circumstance,

22 summary  judgment  should  be  granted,  "so  long  as  whatever  is  before

23 the  district  court  demonstrates  that  the  standard  for  entry  of

24 summary  judgment,  as  set  forth  in  Rule  56(c),  is  satisfied."   <u>Id.</u>

25 at 323.

26 ////

1    If the moving party meets its initial responsibility, the
2 burden then shifts to the opposing party to establish that a
3 genuine issue as to any material fact actually does exist.
4 Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
5 586 (1986); See also First Nat'l Bank of Ariz. v. Cities Serv. Co.,
6 391 U.S. 253, 288-89 (1968); Secor Limited, 51 F.3d at 853.

7    In attempting to establish the existence of this factual
8 dispute, the opposing party may not rely upon the denials of its
9 pleadings, but is required to tender evidence of specific facts in
10 the form of affidavits, and/or admissible discovery material, in
11 support of its contention that the dispute exists.  See Fed. R.
12 Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11; See also First
13 Nat'l Bank, 391 U.S. at 289; Rand v. Rowland, 154 F.3d 952, 954
14 (9th Cir. 1998).  The opposing party must demonstrate that the fact
15 in contention is material, i.e., a fact that might affect the
16 outcome of the suit under the governing law, Anderson v. Liberty
17 Lobby, Inc., 477 U.S. 242, 248 (1986); Owens v. Local No. 169,
18 Assoc. of Western Pulp and Paper Workers, 971 F.2d 347, 355 (9th
19 Cir. 1992) (quoting T.W. Elec. Serv., Inc. v. Pacific Elec.
20 Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the
21 dispute is genuine, i.e., the evidence is such that a reasonable
22 jury could return a verdict for the nonmoving party, Anderson, 477
23 U.S. 248-49; see also Cline v. Industrial Maintenance Engineering
24 & Contracting Co., 200 F.3d 1223, 1228 (9th Cir. 1999).

25    In the endeavor to establish the existence of a factual
26 dispute, the opposing party need not establish a material issue of

fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  First Nat'l Bank, 391 U.S. at 290; See also T.W. Elec. Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); see also International Union of Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); See also In re Citric Acid Litigation, 191 F.3d 1090, 1093 (9th Cir. 1999).  The evidence of the opposing party is to be believed, see Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, see Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)(per curiam)); See also Headwaters Forest Defense v. County of Humboldt, 211 F.3d 1121, 1132 (9th Cir. 2000). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d

1   898, 902 (9th Cir. 1987).

2   Finally, to demonstrate a genuine issue, the opposing party

3   "must do more than simply show that there is some metaphysical

4   doubt as to the material facts. . . . Where the record taken as a

5   whole could not lead a rational trier of fact to find for the

6   nonmoving party, there is no 'genuine issue for trial.'"

7   <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

8   **III.**

9   **ANALYSIS**

10  **A.   COVERAGE UNDER THE SOULTS' POLICY**

11  The instant motion presents the threshold question of whether

12  an exclusion contained in the Soults' homeowners policy precludes

13  coverage of the July 8, 2001 accident.  As I explain below, the

14  parties' motions for summary judgment relating to coverage must be

15  denied because there remain disputed facts which pertain to whether

16  the Ford Ltd. qualifies as a "motor vehicle" and whether the

17  accident arose out of the "use or maintenance" of the Ford Ltd.

18  Under California law, the Soults' policy is to be interpreted

19  from the perspective of what a reasonable person in the position

20  of the insured would have understood the words to mean.  <u>Montrose</u>

21  <u>Chem. Corp. v. Admiral Ins. Co.</u>, 10 Cal.4th 645, 666-667 (1995).

22  "The policy should be read as a layman would read it and not as it

23  might be analyzed by an attorney or an insurance expert." <u>Crane v.</u>

24  <u>State Farm Fire & Cas. Co.</u>, 5 Cal.3d 112, 115 (1971); <u>see also</u>

25  <u>Reserve Ins. Co. v. Pisciotta</u>, 30 Cal.3d 800, 807 (1982).

26  ////

11

Ambiguities in coverage clauses are normally resolved in favor of upholding the insured's reasonable expectations. Montrose, supra, 10 Cal.4th at 667.  Finally, if neither the plain meaning of the words used nor the reasonable expectations of the insured resolve the ambiguity in an insurance policy, the policy will be construed against the insurer. Bank of the West v. Superior Court, 2 Cal.4th 1254, 1265 (1992).

Coverage exclusions and limitations are strictly construed against the insurer and liberally interpreted in favor of the insured.  Delgado v. Heritage Life Ins. Co., 157 Cal.App.3d 262, 271 (1984); Healy Tibbitts Constr. Co. v. Employers' Surplus Lines Ins. Co., 72 Cal.App.3d 741, 749 (1977).  Exceptions to exclusions are construed broadly in favor of the insured.  National Union Fire Ins. Co. v. Lynette C., 228 Cal.App.3d 1073 (1991); see also American Star Ins. Co. v. Ins. Co. of the West, 232 Cal.App.3d 1320, 1327) (1991).

### a. **Was the Ford Ltd. a "Motor Vehicle"**?

_____  The Soults' homeowners policy excludes from coverage any "bodily injury or property damage arising out of the ownership, maintenance, use, occupancy, renting, loaning, entrusting, loading or unloading of any motor vehicle or trailer."  Plaintiff contends that the exclusion does not apply because "the instrument of plaintiff's injury was an engine," and not a "motor vehicle."  Pl.'s Mot. at 10.  Defendant, on the other hand, maintains that the instrument was, in fact, a "motor vehicle," and argues that Allstate's policy did not cover the claim.  Def.'s Mot. at 11.

1  Under the law, it appears that plaintiff's point is well-taken.

2  Plaintiff cites <u>Civil Serv. Employees Insur. Co v. Wilson</u>, 22

3  Cal.App.2d 519 (1963), for the proposition that the Ford Ltd. was

4  not a "motor vehicle."[5]  Relying on <u>Wilson</u>, plaintiff argues that

5  the instrument of plaintiff's injury was "an engine contained in

6  a junker 1977 Ford LTD which was not subject to registration under

7  California Vehicle Code §4000."  Pl.'s Mot. at 8.  Defendant

8  maintains that the <u>Wilson</u>'s court's reliance on the Vehicle Code's

9  definition of "automobile" is inapt because the plain language

10  controls, and thus, "technical definitions from statutes do not

11  count" (citing <u>Bluehawk v. Continental Ins. Co.</u>, 50 Cal.App.4th

12  1126 (1996)).  It argues that reliance on the Vehicle Code's

13  definition would be tantamount to relying on a prohibited extrinsic

14  aid.  Defendant alternatively argues that unlike the vehicle in

15  <u>Wilson</u>, the Ford Ltd. "was capable of self-propulsion," and

16  finally, that "even cars in a state of monumental disrepair are

17  still motor vehicles."  Def.'s Mot. at 14.  The defendant's resort

18  to common sense is appealing, but cannot prevail.[6]

19  ////

20

21      [5]  In <u>Wilson</u>, an automobile insurer attempted to avoid paying
       for a car accident based on a policy requirement that the policy
22  holder insure all of her automobiles through it.  The insurer
       argued that the policyholder voided her policy because she did not
23  insure a 1946 Chevrolet that she had inherited.  The court relied
       on the legal definition of "motor vehicle" contained in Section 415
24  Vehicle Code which requires "self-propulsion" to be considered a
       vehicle and held that the 1946 Chevrolet was not a motor vehicle.

25

26      [6]  As I have noted elsewhere, however, common sense is what
       tells us the world is flat.

13

1     While it is true that extrinsic interpretative aids may
2  be utilized to interpret a policy's definition only when the policy
3  language is ambiguous, the court need not rely on "extrinsic
4  interpretive aids" in this instance.  <u>Bank of the West v. Superior</u>
5  <u>Court</u>, 2 Cal.4th 1254 1264-1265 (interpretative aids and rules
6  employed only when insurance policy is ambiguous); <u>Smyth v. USAA</u>
7  <u>Property & Casualty Ins. Co.</u>, 5 Cal.App.4th 1470, 1474 (1992)
8  (principles of construction "'come[] into play only if it is first
9  determined that an ambiguity exists, which is also a question of
10 law' "]).  Nor need the court rely on what defendant characterizes
11 as "<u>Wilson</u>'s decades-old, restored-to-self-propulsion test" to
12 conclude that a "motor vehicle" requires self-propulsion, that is
13 because the Code's definition mirrors the ordinary, i.e., plain,
14 meaning of "motor vehicle."   <u>See</u> American Heritage Dictionary of
15 the English Language, Fourth Edition (motor vehicle defined as "[a]
16 self-propelled wheeled conveyance, such as a car or truck, that
17 does not run on rails."); <u>See also</u> Merriam-Webster Dictionary Third
18 New International Dictionary, Unabridged (2002)(motor vehicle
19 defined as "an automotive vehicle not operated on rails," where
20 "automotive" refers to something "of, relating to, or concerned
21 with self-propelled vehicles or machines").  Given the plain
22 meaning of "motor vehicle," the court concludes that "a reasonable
23 person in the position of the insured well might have understood
24 the words "motor vehicle" to mean a conveyance that is "self-
25 propelling," or operable, which, as noted, as it relates to the
26 Ford Ltd., is disputed.

1    Defendant insists that even if the Vehicle Code's definition

2  applies, the Ford Ltd. qualifies as a motor vehicle because it was

3  capable of self-propulsion or being restored to that condition.

4  Def.'s Mot. at 13-14.  Defendant cites to evidence in the record

5  that the car started and ran for 30 seconds to a minute, that it

6  was "intact, with an engine, transmission, steering wheel

7  windshield, tires, rims, etc.," and that Dennis Martin - the only

8  mechanic who inspected the car - could have put it in driveable

9  condition.  Id.  Defendant ignores other evidence in the record

10 which puts this contention in dispute.  Evidence offered by

11 plaintiff suggests that the Ford Ltd. was not capable of self-

12 propulsion, and it is unclear from the record whether the Ford

13 could have been restored to a self-propelling state.  Teresa

14 Voboril stated that she did not believe the car was driveable in

15 any way when she gave it to Martin.  Pl.'s SUF 29.  When the

16 vehicle was transferred to Dennis Martin, she believed the only

17 thing of value was the engine.  Pl.'s SUF 33.  Even though Martin

18 stated that "he could get anything running," he also noted that the

19 vehicle was unsafe and "never had it in his mind" to put the car

20 in driveable condition.  Pl.'s SUF 77, citing Martin Dep. at 29-30.

21 As noted above, Martin never registered the Ford to be driven on

22 the highway.  Pl.'s SUF 78.  Put directly, a dispute exists as to

23 whether the Ford Ltd. constituted a "motor vehicle."

24 ////

25 ////

26 ////

1      **b.   <u>Accidents arising out of the "use or maintenance" of</u>**
              **<u>a motor vehicle</u>**

2

3          In addition to the issue noted above, there appears to be

4    another disputed issue of material fact which bears on whether or

5    not the exclusion precludes coverage of Back's accident.   The

6    Allstate homeowners policy excludes from coverage "accidents that

7    arise out of the use or maintenance of a motor vehicle."[7]  Despite

8    defendant's unambiguous assertion that "no one can dispute that

9    Back was injured as he was starting a 1977 Ford LTD," Def.'s Mot.

10   at 12, it is indeed unclear from the evidence presented whether

11   Back poured the gasoline into the carburetor to "use or maintain"

12   the Ford Ltd.   Put differently, there is a factual dispute as to

13   whether the parties were attempting to "maintain" the Ford Ltd. -

14   that is, to bring it into a state of repair or efficiency, or

15   whether, as Martin's deposition suggests, Back poured the gasoline

16   into the carburetor to "fire" the engine in order to see if the

17   engine would work.

18         In his version, Martin explained to Jonathan Soult on July 8,

19   2001 that the Ford Ltd. "was given to [him] for parts and [he] was

20   going to use the engine, so [he] wanted to hear it fire."   Martin

21

22         [7]  Because "maintenance" is not defined anywhere in the
     policy, it is to be interpreted from the perspective of what a
23   reasonable person in the position of the insured would have
     understood the words to mean. <u>Montrose Chem. Corp. v. Admiral Ins.</u>
24   <u>Co.</u>, 10 Cal.4th at 666-667 (1995).   In this instance, the court
     concludes that a reasonable person would have understood
25   "maintenance" as it is ordinarily defined, i.e., "the labor of
     keeping something in a state of repair or efficiency."  Webster's
26   Third New International Dictionary, Unabridged (2002).

Dep. at 18.  Apparently, after Martin and Soult "got [the Ford] to fire," the car "ran out of gas," so Martin and Back went to the gas station for more gasoline.  Id. at 19.

It is unclear whether Back poured the gasoline in the carburetor to use or maintain the Ford Ltd., but Martin's deposition suggests that Martin and Back never intended to maintain the Ford and get it back to running order.  Rather, the evidence suggests that Martin, Back, and Soult poured gasoline into the Ford Ltd. to "fire" the engine.  Martin asserts that he was never interested in restoring the Ford and that he "looked at it as an engine block . . . a piece of junk that should have never entered the street and never would have."  Martin Dep. at 28, 36.  Martin consistently maintained that he did not consider the car to have any value outside of the value of the engine.  Id. at 32.  For all of the above reasons, I conclude that it is disputed whether Back, Martin, and Soult were "us[ing]" or "maintaining" the Ford Ltd. when Back poured the gasoline into the carburetor, causing serious injuries to himself on July 8, 2001.[8]

---

[8]  Somewhat surprising to this court, a number of courts have concluded that "[an] attempt to start [a car] by pouring gasoline into the carburetor, which resulted in the ignition of the gas, involved 'maintenance' of the vehicle within the terms of [the] exclusion."  Broadway v. Great American Ins. Co., 465 So.2d 1124, 1128 (1985).  See also David v. Tanksley, 218 F.3d 928 (8th Cir. 2000); Lawson v. Allstate Ins. Co., 456 So.2d 1235 (1984); North Star Mut. Insur. Co. v. Carlson, 442 N.W.2d 848 (1989); Volkswagon Ins. Co. v. Nguyen, 405 So.2d 190 (1981); Holliman v. MFA Mut. Ins. Co., 289 Ark. 276, 711 S.W.2d 159 (1986); Hollis v. St. Paul Fire & Marine Insur. Co., 416 S.E.2d 827 (1992).  It is, to say the least, unclear to the court how the issue could be one of law rather than fact.  In any event, in the matter at bar there is evidence that Back and Soult never intended to "maintain" or "use"

**B.  DUTY TO SETTLE**

Plaintiff argues that on February 19, 2003, he sent a letter to Allstate which provided for a policy-limits settlement offer which Allstate failed to consider.  Plaintiff contends Allstate acted in bad faith by failing to conduct an investigation into the legitimacy of the Soults' claims.  Pl.'s Mot. at 17.  Allstate, on the other hand, argues that it never received the offer to settle and so cannot be liable for failing to settle and for any bad faith claim premised on such allegations.

Although California courts have held that an insurer must act in good faith "in an effort to negotiate a settlement" and that an insurer owes a duty to respond to settlement demands, see, e.g., Shade Foods, Inc. v. Innovative Prods. Sales and Marketing, Inc., 78 Cal.App.4th 847, 906 (2000), summary judgment cannot be granted regarding bad faith and the policy limits based on Allstate's alleged refusal to settle.

First, I note that there is a disputed issue as to whether defendant ever received the settlement letter.  See Pl.'s Ex. 10. Plaintiff's counsel submits a declaration from his secretary, who claims to have mailed the demand letter.  Defendant, however, contends that it never received the policy-limits demand letter and were not otherwise aware of that demand.  Def.'s Opp'n at 23, citing Sullivan Decl. ¶ 6, Barnes Decl. ¶ 7, Plooy Decl. ¶ 10.

////

the Ford Ltd. but were merely interested in finding out whether the engine could be started.

18

1  Because this issue turns on credibility, summary judgment must be
2  denied.

3      Additionally, the court cannot grant summary judgment based
4  on defendant's alleged failure to settle because, as defendant
5  points out, Back never offered to settle with Jonathan Soult.  It
6  is undisputed that the demand letter that Back's counsel allegedly
7  sent only offers to settle with Deborah Soult.  Thus, as Allstate
8  notes, even if it had received Back's policy-limits demand letter,
9  it could not have accepted it because the letter did not offer to
10 release either Troy Soult or Jonathan Soult, both of whom were also
11 insured under the policy.  Under California law, an insurance
12 company cannot accept an offer that does not release all of its
13 insureds.  See, e.g., Moreno v. Allstate Ins. Co., 2002 WL 31133203
14 at *3 (E.D. Cal. Sept. 10, 2002)("As a matter of law, Allstate
15 could not accept [the] policy-limits settlement offer without
16 obtaining a release for all insureds covered by its liability
17 policy."); Letho v. Allstate Ins. Co., 31 Cal.App.4th 60, 75 (1994)
18 ("[A]n insurer can breach its duty to its insureds by disbursing
19 the policy proceeds to [a] claimant without first obtaining a
20 release of the insureds . . . .  We know of no case permitting an
21 insured . . . to sue for bad faith on the basis of the insurer's
22 rejection of a settlement demand because it did not include a
23 complete release . . . .").  Because Allstate could not accept a
24 settlement offer without obtaining a release for all insureds, the
25 court grants Allstate's motion for summary adjudication as to the
26 ////

1  duty to settle claim, and any claim arising out of Allstate's duty

2  to settle in order to protect its insured.[9]

3  **C.  ALLSTATE'S ALLEGED FAILURE TO INVESTIGATE**

4       Plaintiff contends that Allstate had a duty to provide its own

5  expertise in evaluating the Soults' claims.  Plaintiff contends

6  that Allstate did not conduct any investigation into the facts

7  surrounding plaintiff's claim and that plaintiff is entitled to

8  summary adjudication as to whether the conduct of defendant

9  constituted bad faith.  Defendant disputes these contentions and

10 maintains that it is entitled to summary adjudication with respect

11 to bad faith because there was a legitimate dispute whether

12 Allstate's policy covered the Soults' claim.

13      In order to establish a breach of the implied covenant of good

14 faith and fair dealing under California law, a party must show (1)

15 benefits due under the policy were withheld, and (2) the reason for

16 withholding benefits was unreasonable or without proper cause.

17 Guebara v. Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001)

18 (citing Love v. Fire Ins. Exch., 221 Cal.App.3d 1136, 1151 (1990)).

19 ////

20 ////

21 ////

22

23      [9] Defendant contends that Back is not entitled to any recovery
beyond the policy limits because it could not have accepted the

24 settlement offer.  While the court agrees that no bad faith
liability should attach based on the failure to settle claim, as

25 discussed infra, the court cannot decide whether Back is entitled
to recovery beyond the policy limits because plaintiff also avers

26 that Allstate acted in bad faith by failing to investigate the
Soults' claim.

1  Because the key to a bad faith claim is whether denial of a claim
2  was reasonable, a bad faith claim should be dismissed on summary
3  judgment if the defendant demonstrates that there was "a genuine
4  dispute as to coverage." <u>Id</u>.; <u>and see</u> <u>Feldman v. Allstate Ins. Co.</u>,
5  322 F.3d 660, 669 (9th Cir. 2003).  The Ninth Circuit has held that
6  the "genuine dispute doctrine" should be applied on a case-by-case
7  basis.  <u>Guebara</u>, 237 F.3d at 993.  Thus, the court is in the
8  position of assessing whether Allstate's denial of the Soults'
9  claim was reasonable and whether there was "a genuine dispute as
10 to coverage."  <u>Feldman</u>, <u>supra</u>.

11      While there can be no doubt that there was a dispute
12 concerning coverage, whether denial of the Soults' claim was done
13 in good faith is for the jury.  <u>Guebara</u>, 237 F.3d at 992.  In
14 <u>Guebara</u>, the Ninth Circuit made clear that "the key to a bad faith
15 claim is whether denial of a claim was reasonable," a question that
16 turns on a myriad of facts which can only be determined on a
17 case-by-case basis.  Plaintiff asserts that defendant should have
18 conducted its own investigation rather than assigning such duties
19 to an outside law firm, while defendant argues that there was a
20 legal dispute as to whether the claim was covered in the first
21 instance.  It is clear to the court that the question of
22 reasonableness, a quintessential jury question, is, under the
23 circumstances, not amenable to disposition at the summary judgment
24 stage.  While the Ninth Circuit has explained that a bad faith
25 claim could be dismissed on a summary judgment motion if the
26 defendant demonstrates that there was a "genuine dispute as to

1   coverage," <u>id.</u>, the court refrains from doing so here because a

2   jury might reasonably find that defendant's alleged

3   misrepresentation of the law and of the facts warrants bad faith.

4   The question of "reasonableness" will inevitably engender disparate

5   results because each case will have disparate facts.  The wide and

6   diverse experience of juries then may well be preferred to reliance

7   on the insulated experience of the court in deciding this issue.

8      Plaintiff also requests punitive damages, noting that the

9   Ninth Circuit has held that punitive damages are recoverable where

10  the defendant acts in bad faith.  Pl.'s Mot. at 14.  Defendant

11  argues that it is entitled to summary adjudication on the punitive

12  damages claim because there existed a "genuine issue" as to whether

13  the claim was covered under the policy.  Because, for the reasons

14  explained above, the court cannot resolve the bad faith question,

15  summary judgment as to punitive damages must also be denied.[10]

16                **IV.**

17             **CONCLUSION**

18      For all the foregoing reasons, the court hereby ORDERS as

19  follows:

20      1.  The parties' motions for summary adjudication as to

21  whether Back's accident was covered under the Soults' policy are

22  DENIED.

23  ////

24

25       [10]   The court notes that "[d]eterminations related to assessment of punitive damages have traditionally been left to the discretion of the jury." <u>Amadeo v. Principal Mutual Life Ins. Co.</u>,

26  290 F.3d 1152, 1165 (9th Cir. 2002)(citation omitted).

1      2.  Defendants' motion for summary adjudication as to the duty

2  to settle claim, and bad faith premised upon such allegation, is

3  GRANTED.

4      3.   The parties' motion for summary adjudication as to bad

5  faith premised upon Allstate's alleged failure to investigate are

6  DENIED.

7      4.   The parties' motions for summary adjudication as to

8  punitive damages are DENIED.

9      IT IS SO ORDERED.

10     DATED:   July 13, 2005.

11                                    /s/Lawrence K. Karlton
                                      LAWRENCE K. KARLTON
12                                    SENIOR JUDGE
                                      UNITED STATES DISTRICT COURT
13

14

15

16

17

18

19

20

21

22

23

24

25

26